IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH MESSNER, *on behalf of himself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>STINGRAY MUSIC USA INC.,<br><br>Defendant. | Case No. 22-6636<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710** |

**CLASS ACTION COMPLAINT**

Plaintiff Keith Messner ("Plaintiff") brings this class action lawsuit in his individual capacity and on behalf of all others similarly situated against Stingray Music USA Inc. ("Stingray" or "Defendant") and alleges, upon personal knowledge as to his own actions, his counsel's investigation and information and good faith belief as to all other matters, as follows:

**INTRODUCTION**

1. This is a consumer digital privacy class action complaint against Stingray for disclosing its digital subscribers' identities and video-viewing history—without their consent—to Meta Platforms Inc. ("Meta"), which owns the social networking website and mobile application Facebook, and other third parties, in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA" or "the Act").

2. The VPPA prohibits "video tape service providers," such as Stingray, from knowingly disclosing consumers' personally identifiable information ("PII"), including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without express consent "in a form distinct and separate from

1

any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(1)-(2).

3. Stingray owns and operates Qello, a membership-based digital concert streaming service that sells access to video content, such as on-demand concerts and music documentaries.

4. In order to access this video content, users are required to provide PII, including their (i) first name, (ii) last name, (iii) email address and (iv) billing information, such as their credit card number or PayPal account information.

5. Defendant violated the VPPA by knowingly disclosing Plaintiff's and Class Members' PII", including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without their express consent to the disclosures in a standalone consent form.

6. As detailed herein, Defendant knowingly employs tracking technologies (namely, pixels) to collect and to share with third parties, such as Facebook, the video viewing information of its subscribers without obtaining informed, standalone consent as is required.

7. Through the use of these analytics tools, Stingray tracks and discloses to third-party business partners the digital subscribers' viewed video history and, most notably, unique identifying information along with requested or obtained video content ("Personal Viewing Information"). This occurs even when the digital subscriber has not shared (nor consented to share) such information. Stingray profits handsomely from its unauthorized disclosure of its digital subscribers' Personal Viewing Information to third parties at the expense of its digital subscribers' privacy and their statutory rights under the VPPA.

8. Importantly, Stingray shares the Personal Viewing Information—i.e., digital subscribers' unique Facebook ID ("FID") and video content viewed together as one data point.

Any ordinary person can use it to quickly and easily locate, access, and view digital subscribers' corresponding account(s) and/or profile(s).

9.      Put simply, Stingray's disclosures allow third parties to know what specific video materials or services each user requested or obtained from Stingray's video-streaming platform, Qello.

10.     Accordingly, Plaintiff, on behalf of a class of similarly situated users, asserts a claim for violations of the VPPA and seeks all appropriate relief including, but not limited to, statutory damages in an amount not less than $2,500 for each disclosure of PII, punitive damages and attorneys' fees and costs.

## PARTIES

11.     Plaintiff Keith Messner is a citizen and resident of Rochester, New York. Mr. Messner used his internet-connected device and the web-browsing software installed on that device to visit and watch video content on Defendant's streaming platform during the Class Period.

12.     Defendant Stingray Music USA, Inc., is a company incorporated under the laws of the State of Delaware, with its principal place of business in Montreal, Quebec. Stingray owns and operates the video-streaming platform Qello, which provides a broad selection of music video content to its digital subscribers.

## JURISDICTION & VENUE

13.     This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiff's claims under the Video Privacy Protection Act, 18 U.S.C. § 2710.

14.     This Court also has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA") because this lawsuit is a proposed class action in which: (i) there are at least 100 Class members; (ii) the combined claims of class members exceed

$5,000,000, exclusive of interest, attorneys' fees and costs and (iii) Defendant and at least one class member are domiciled in different states.

15.     This Court has personal jurisdiction over Defendant because (i) the claims asserted in this action arose within this district, (ii) the injuries and damages occurred in this district and (iii) Defendant has sufficient minimum contacts in New York to render the exercise of jurisdiction by this Court proper and necessary.

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, Defendant has considerable business presence in this judicial district and Defendant has a registered agent in Albany, New York to accept service.

## COMMON FACTUAL ALLEGATIONS

*Defendant's Business & Membership Tiers*

17.     Stingray, through its streaming platform Qello, provides a subscription-based video streaming service to its digital subscribers. Qello is available on a broad range of devices, including mobile phones, smart televisions, gaming consoles, etc.

18.     In 2018, Qello Concerts was the "world's leading over-the-top (OTT) streaming service for full-length, on-demand performances, concert films, and music documentaries— reaching users in more than 160 countries."[1] Stingray has spent over $849 million on acquisitions since its inception, making "Stingray the leading distributor of SVOD [subscription video on demand] concerts in the world."[2]

---

[1]     *See* Stingray Annual Report 2018, at 3, *available at* https://www.annualreports.com/HostedData/AnnualReportArchive/s/TSX_RAY_2018.pdf (last accessed October 23, 2023).

[2] *Id*.

4

19. Defendant offers a yearly membership for $99.99 per year and a monthly plan for $11.99 per month. Both membership plans include complete access to Qello's on-demand video content database.



20. To become a subscriber, users create a profile and/or account with Qello. Qello users provide their personal information, including but not limited to their name, email address, address or postal code, and payment method(s).

21. On information and belief, all digital subscribers provide Defendant with their Internet Protocol (IP) address, which is a unique number assigned to all information technology-connected devices that informs Defendant as to subscribers' city, zip code and physical location.

22. Notably, once a digital subscriber signs in and watches video content on Stingray's streaming platform Qello, the digital subscriber is not provided with any notification that their Personal Viewing Information is being shared. Defendant also fails to obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and

5

separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

*Defendant Uses Pixels to Transmit Users' Video Viewing Histories to Facebook*

23. In order to view Defendant's video material, a user, such as Plaintiff, must first provide to Stingray their Facebook, Amazon, Google Account, or Apple ID and their (i) first name, (ii) last name, (iii) email and (iv) billing information, such as zip code and credit card number or PayPal account information.

24. Only after the user provides their personal information to create an account with Qello are they then able to view prerecorded video content from Defendant.

25. While Plaintiff and Class members were viewing prerecorded video content on Defendant's streaming platform, Defendant transmitted their viewing choices to Meta.

26. Specifically, Defendant shared with Meta the specific names of the video content viewed by users together with the user's individualized FID, a string of numbers unique to each Facebook profile that personally identifies the user.

27. Just as Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website.[3]

28. Ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers—any ordinary person could learn the identity of the digital subscriber and the specific video or media content they requested on Stingray.

---

[3] *See* https://www.facebook.com/help/211813265517027 (last visited Oct. 26, 2023).

29. When a video is accessed on Defendant's streaming platform, the name and viewer's FID, which is represented by the "c_user" cookie, are sent to Meta.[4]

30. For example, if a subscriber clicks on one of the videos, such as Rihanna's "Live at Made in America," that event gets shared with Facebook, along with the user's FID in the c_user cookie value, which links the user to their unique Facebook account. The figure below highlights how Stringray shares both the title of the video a user has viewed and the user's unique identifying FID through the c_user cookie value:



---

[4] The "c_user" cookie that is transmitted contains the viewer's unencrypted FID.

31. The below figure taken from the same page view more clearly shows that Defendant Stingray is sharing the titles of the videos its users are viewing or requesting:



32. Additionally, Defendant transmits the FID and video titles to Meta in a single transmission, through an invisible tracking tool called a "Meta Pixel."

33. A Meta Pixel is a snippet of a programming code that—once installed on a webpage—sends information to Meta. This transmission occurs when a user views a prerecorded video on Defendant's streaming platform.

34. Tracking tools, such as the Meta Pixel, are distinct from traditional first and third-party cookies.

35. Cookies are small files of information that a web server generates and sends to a web browser"; "[c]ookies help inform websites about the user, enabling the websites to personalize the user experience."[5]

36. The Facebook Tracking Pixel is an advertising tool that allows website owners to track visitor actions on their websites for purposes of sending the corresponding information to Meta. Websites use the Pixel in hopes of better targeting their products and services on Facebook to interested consumers.

37. Importantly, cookies cannot follow users across devices, but tracking pixels can.[6]

38. Additionally, cookies place information on users' browsers, but tracking pixels send information directly to a third-party web server.[7]

39. Another notable difference is that cookies can be blocked or cleared by users from the browser settings, but tracking pixels are not easily disabled by the end-user.[8]

40. According to Meta, the Pixel allows it "to match your website visitors to their respective Facebook User accounts", and that "[o]nce matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."[9]

41. Thus, a business such as Defendant chooses to install the Pixel on its streaming platform in order to increase its profits.

---

[5] *See* https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Nov. 2, 2023).

[6] *See* https://www.iubenda.com/en/help/110275-tracking-pixel-vs-cookie-explained-and-why-it-should-matter-to-you#pixels-vs-cookies-differences (last visited Nov. 2, 2023).

[7] *Id*.

[8] *Id*.

[9] *See* https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Oct. 26, 2023).

42. Defendant tracks every step of their user's activity on its streaming platform. As an example, if a user stops watching a video and hits pause, Defendant tracks that as well, by capturing the inner text of the buttons the user is clicking:

```
Headers  Payload  Preview  Response  Initiator  Timing  Cookies
▼Query String Parameters    view source    view URL-encoded
id: 632958894546498
ev: SubscribedButtonClick
dl: https://qello.com/app/concert/1962713/rihanna/live-at-made-in-america
rl:
if: false
ts: 1698982901791
cd[buttonFeatures]: {"classList":"vjs-control vjs-button player-button button-pause","destination":"","id":"","imageUrl":"","innerText":"pause","numChildButtons":0,"tag":"button","type":"button","name":"","value":""}
cd[buttonText]: pause
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Watch Live at Made in America - Rihanna online - Qello Concerts"}
cd[parameters]: []
```

43. Thus, equipped with an FID and the video content name and URL—all of which Defendant knowingly provides to Meta without necessary standalone consent from its subscribers—Stingray is disclosing that the user is requesting and obtaining specific video material and the name of that specific video material. Thus, any ordinary person could determine the identity of Defendant's subscribers and the specific video or media content they viewed on Defendant's streaming platform.

44. Defendant knew that by installing the Pixel on its streaming platform, the Pixel would send Meta information identifying its users and their video-watching habits.

45. Meta explains that to begin using the Meta Pixel, a business must first "install" the Pixel "by placing the Meta Pixel base code on all pages of your website[.]"[10]

---

[10] *See* https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last

46. Defendant, therefore, made a conscious and intentional choice to install the Pixel on its streaming platform to share itssubscribers' video viewing histories with Meta for marketing purposes in violation of the VPPA.

47. Further demonstrating that Defendant knowingly placed the Pixel in their website's code, Meta's website states that "[d]evelopers and marketers can *optionally choose* to send information about" a visitor's activity on its website.[11]

48. Meta benefits from websites like Defendant installing its Pixel because when the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook and/or other Meta-owned platforms like Instagram.

49. In addition, even if the business does not advertise with Facebook, the Pixel assists Meta in building more fulsome profiles of its own users, which in turn allows Meta to profit from providing more targeted ads.

50. Using the Meta Pixel likewise benefits Defendant's business by improving its ability to promote its content and services to its users.

51. Through the use of the Meta Pixel, Defendant discloses to Meta the full name of each video a user watched, together with the user's FID, thus linking users' viewing content choices and preferences to their Facebook profiles.[12]

52. Defendant violates and invades the privacy rights of users with their practice of sending users' FIDs, together with their viewing content, to Meta.

---

visited Oct. 26, 2023).

[11] *See* https://developers.facebook.com/docs/meta-pixel/ (last visited Oct. 26, 2023).

[12] In other words, this single transmission connects a user's video content with their FID.

53. Plaintiff and Class members neither authorized nor otherwise consented to Defendant's disclosure of their prerecorded video and video-services requests and their identities to Meta.

54. As a result, Defendant violates the VPPA by disclosing this information to Meta.

*Defendant Does Not Obtain Consent For Their Use of the Meta Pixel*

55. The VPPA requires that consent be obtained in a form "distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710.

56. At no point was Plaintiff provided a standalone consent form disclosing Defendant's practices at issue and requesting user consent.

57. Hence, no user consented to Defendant's offending practice of sharing video preferences with third parties.

*Plaintiff & the Class Were Harmed by Defendant's Privacy Invasions.*

58. Defendant shared with Meta the personal information of Plaintiff and Class members, including their video viewing histories and associated FIDs, which Plaintiff and the Class members reasonably expected would be kept private.

59. The personal information Defendant obtained from Plaintiff and Class members constitutes valuable data in the digital advertising-related market for consumer information.

60. Defendant's wrongful acquisition and use of their personal, private information deprived Plaintiff and Class members of control over that information, prevented them from realizing its full value for themselves and constituted an intrusion upon the seclusion and privacy of Plaintiff and Class members.

61. Defendant's conduct caused economic harm to Plaintiff and Class members whose PII diminished in value when Defendant made this information available to Meta.

62. The harms described above are aggravated by Defendant's continued retention and commercial use of Plaintiff's and Class members' personally identifiable information, including their private video viewing histories.

63. The relationship between Plaintiff and other subscribers to Defendant was and continues to be substantial in that it involved creating a paid account, which committed subscribers to ongoing, financial relationships with Defendant.

64. As a necessary condition for accessing the videos on Defendant's streaming platform, users were required to become paid subscribers and to submit their name, email and billing information, including their zip code and financial account information to Stingray. Non-subscribers are prohibited from viewing the videos as that benefit was reserved for paid subscribers.

65. The subscribers actively provided PII and money in exchange for a subscription to otherwise restricted video content, which Defendant provided in an ongoing and recurrent fashion, as defined by the various membership tiers.

66. Subscribers paid, registered, committed and associated with Defendant in exchange for the delivery of and access to restricted video content.

## REPRESENTATIVE PLAINTIFF ALLEGATIONS

67. Plaintiff Keith Messner is a paying Qello subscriber and a Facebook user.

68. Mr. Messner has maintained a Qello membership and account since at least June 2023 and is thus a subscriber to Defendant's services.

69. Mr. Messner provided Defendant with his PII, including at least his first and last name, email address, mobile phone number, and credit card information when subscribing to its video streaming services.

70. Mr. Messner paid $11.99 per month for his streaming subscription to Qello.

71. Mr. Messner's Facebook profile includes his name and other personal details.

72. Mr. Messner watches prerecorded video content on Defendant's streaming platform, Qello, regularly.

73. Mr. Messner watched a recorded concert as recently as October 2023.

74. Mr. Messner visited Defendant's streaming platform to request and watch prerecorded video content using the same browser that he uses to log in to Facebook and viewed such video content while he was logged in to Facebook.

75. After watching video content on the Defendant's streaming platform he was subsequently targeted with advertisements on Facebook related to that video content.

76. For example, after watching a Beyonce concert on Qello, Mr. Messner received a targeted advertisement for tickets to Beyonce's Renaissance Tour on his Facebook page.

## CLASS ACTION ALLEGATIONS

77. Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representatives of the Class preliminarily defined as:

> **Nationwide Class**: All persons in the United States who have a Facebook account, subscribed to Defendant's streaming platform and viewed prerecorded video content on Defendant's streaming platform during the time Meta's Pixel was active on Defendant's streaming platform.

78. Excluded from the Class are Defendant, its employees, agents and assigns and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families and Plaintiff's counsel.

79. Plaintiff reserves the right to modify, change or expand the Class definition based upon discovery and further investigation.

80. **Numerosity**: The Class consists of hundreds of thousands of individuals, making joinder wholly impractical.

81. **Commonality and Predominance**: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include:

   a. Whether Defendant's use of the Meta Pixel was without user consent or authorization;

   b. Whether Defendant obtained and shared or caused to be obtained and shared Plaintiff's and Class members' personal information through tracking using Meta Pixel, which Defendant installed on its webpages;

   c. Whether third parties obtained Plaintiff's and Class members' personal information as a result of Defendant's conduct described herein;

   d. Whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;

   e. Whether Defendant was unjustly enriched as a result of sharing users' information with Meta;

   f. Whether Defendant's acquisition and transmission of Plaintiff's and Class members' personal information resulted in harm and

   g. Whether Defendant should be enjoined from engaging in such conduct in the future.

82. **Typicality**: Plaintiff's claims are typical of the claims of the Class members in that Plaintiff, like all Class members, has been injured by Defendant's misconduct at issue—i.e., disclosing users' PII and viewing content to Meta without appropriate consent.

83. **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy protection cases. Plaintiff does not have any interests antagonistic to those of the Class.

84. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendant to comply with applicable law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Defendant's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this Complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

85. **Injunctive relief**: Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## TOLLING OF THE STATUTE OF LIMITATIONS

86. All applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment of the facts alleged herein. Plaintiff and Class members could not have reasonably discovered Defendant's practices of sharing their personal viewing content and PII with Meta until shortly before this class action litigation commenced.

87. Defendant was and remains under a continuing duty to disclose to Plaintiff and Class members their practice of sharing personal video viewing content and PII to Meta. As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FIRST CAUSE OF ACTION

**Violation of the Video Privacy Protection Act (the "VPPA")**
**18 U.S.C. § 2710, *et seq.***
(***On Behalf of the Nationwide Class***)

88. Plaintiff incorporates and realleges the above factual allegations by reference.

89. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

90. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

91. Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials—including the prerecorded videos that Plaintiff viewed—through their online platform that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

92. As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

93. Defendant knowingly caused personal video viewing information, including FIDs, identifying Plaintiff and Class members, to be disclosed to Meta.

94. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and Class member to Meta as an individual who viewed Defendant's video content, including the specific prerecorded video materials each such individual watched on Defendant's streaming platform.

95. This information allowed Meta to identify each Plaintiff and Class members' specific individual video-viewing preferences and habits.

96. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiff

17

is a subscriber to Defendant's services—that provide video content to users on their streaming platform—and viewed prerecorded videos provided on Defendant's platform. Hence, Plaintiff is a "consumer" under this definition.

97. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form ***distinct and separate from any form*** setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner.

98. Defendant failed to obtain informed, written consent as required by the VPPA under this definition.

99. Additionally, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(b)(2)(B)(iii).

100. The Act requires video tape service providers to "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."

101. Defendant failed to provide an opportunity to opt out as required by the Act.

102. Defendant was aware that the disclosures to Meta that were shared through the Pixel identified Plaintiff and Class members. Defendant also knew that Plaintiff's and Class members' personal viewing content was disclosed to Meta because Defendant programmed the Meta Pixel into its website code, knowing that Meta would receive video titles and the subscriber's FID when a user watched a prerecorded video.

103. By knowingly disclosing Plaintiff's and Class members' personal viewing content, Defendant violated Plaintiff's and Class members' statutorily protected right to privacy in their prerecorded video-watching habits. *See* 18 U.S.C. § 2710(c).

104. As a result of the above violations, Defendant is liable to Plaintiff and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "liquidated damages not less than $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A).

105. Under the Act, Defendant is also liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendant in the future.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

   A. Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

   B. Enter judgment in favor of Plaintiff and the Class;

   C. Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and Class members, including reformation of practices and an accounting and purging of wrongfully obtained personal information;

   D. Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to which Plaintiff and Class members are entitled;

   E. Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

   F. Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

   G. Enter such other orders as may be necessary to restore to Plaintiff and Class members any money and property acquired by Defendant through its wrongful conduct;

   H. Award Plaintiff and Class members reasonable litigation expenses and attorneys' fees as permitted by law and

I. Award such other and further relief as the Court deems necessary and appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues triable as of right.

Dated: November 7, 2023

Respectfully submitted,

/s/ James J. Bilsborrow
James J. Bilsborrow
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
(212) 558-5500
jbilsborrow@weitzlux.com

ALMEIDA LAW GROUP LLC
David S. Almeida (3056520)
Matthew J. Langley (4831749)
Britany A. Kabakov*
849 W. Webster Avenue
Chicago, Illinois 60614
Phone: 312-576-3024
david@almeidalawgroup.com
matt@almeidalawgroup.com
britany@almeidalawgroup.com

*Attorneys for Plaintiff & the Class*
*pro hac vice motion forthcoming